### McCAIN v. PAN–AMERICAN PETROLEUM CORPORATION et al.*

### No. 4312.

Court of Appeal of Louisiana. Second Circuit.

June 15, 1932.

---

*Rehearing granted July 14, 1932.

Hawthorn, Stafford & Pitts, of Alexandria, and Cobb & Jones, of New Orleans, for appellants.

C. H. McCain, of Colfax, and Harry Fuller, of Winnfield, for appellee.

McGREGOR, J.

On December 12, 1929, plaintiff, Milling McCain, while on his way to make a visit to his mother in the city of Natchitoches, was driving a Buick roadster on the gravelled highway between the towns of Montgomery and Natchitoches. Just after he left Montgomery and was about to enter the main highway from one of the side streets of the town, he paused for a moment to permit S. M. Sims, one of the defendants, to pass ahead of him, driving a Pan-American Petroleum Corporation truck. Sims evidently was running the oil truck at least as fast as plaintiff was driving his Buick roadster, for he stayed in the lead for about a mile and a half. J. F. Rhodes, with his wife on the front seat and a negro man standing at the back of the seat, entered the road ahead of Sims in a kind of dismantled 1924 model T Ford touring car. He was passed first by Sims with his oil truck and then by plaintiff in his Buick roadster.

As soon as plaintiff had passed the Rhodes car, he continued on the left side of the road with the apparent intention of passing the Sims oil truck. From the testimony it seems apparent that Sims was not aware of the plaintiff's desire or intention to pass him, though it was proved, and is now admitted, that plaintiff blew several loud blasts of his automobile horn to indicate his intention to pass. Be that as it may, just as plaintiff was about even and parallel with the oil truck, there was a collision between the two, with the result that plaintiff was thrown forward out of his car over one hundred feet from the point of the collision, and the Buick roadster was practically demolished. Sims brought his truck to a standstill within a relatively few feet, and neither he nor the truck was injured to any appreciable extent. Plaintiff fell in a sitting posture. One of his lumbar vertebræ was fractured, and several severe lacerations about the body were received by him.

Quite a number of people soon gathered around the scene of the accident. As quickly as possible, Sims, with the assistance of others, placed the plaintiff in his truck and carried him back to Montgomery to the residence of Dr. John I. McCain, an uncle of the plaintiff. At the earliest date possible, eleven days after the collision, plaintiff was removed to the home of his mother in the town of Natchitoches, where he remained for some time. On May 21, 1930, this suit was filed against the Pan-American Petroleum Corporation, and on August 30, 1930, the petition was amended so as to include S. M. Sims as a party defendant. In his petition as amended

and supplemented the plaintiff prayed for judgment in solido against the defendants for damages in the sum of $60,002.50, which he itemized as follows:

(a) Amount due by petitioner to John I. McCain for care, attention, treatment, board, lodging and keep for a period of eleven (11) days immediately following receipt injuries................ $  55.00

(b) Amount due Dr. N. M. Brian for professional services rendered in treatment of petitioner's injuries, for medicines, gauzes, bandages, etc.,.........  347.50

(c) Amount due petitioner as actual and compensatory damages for injuries received and sustained rendering him permanently and totally disabled..... 54,600.00

(d) Amount due petitioner for mental pain, mental anguish, and mental suffering...............  5,000.00

Total ...................... $60,002.50

There was a long, drawn-out trial, extending through five days, with a record of over five hundred pages. Judgment was rendered in favor of the plaintiff against the defendants in solido for the sum of $7,000. The defendants have appealed, and the plaintiff has answered the appeals, and prays that the damages awarded be increased to $20,000.

#### Opinion.

In his petition, as amended and supplemented, plaintiff alleges that the defendant Sims was an agent and employee of the defendant Pan-American Petroleum Corporation, and that the collision in which he received the injuries complained of was caused by the negligence of Sims while engaged in the business of his principal or employer. The defendants deny the agency of Sims, and aver that the plaintiff, driving at an excessive rate of speed, sideswiped the truck in attempting to pass it. Plaintiff's version of how the collision occurred is contained in paragraphs 11 and 12 of his original petition, which read as follows:

"That petitioner was driving his father's said automobile upon the aforesaid highway in a northerly direction, and at a legal and moderate rate of speed; that he came up within a proper distance of defendant's said motor truck then being driven by the said S. M. Sims, along said highway in the same direction, and at a point about one mile north of Montgomery, in said Parish of Grant, Louisiana; that, observing the left side of the road to be clear and free of oncoming traffic, petitioner desired to overtake and pass said motor truck; that he sounded the horn of the automobile which he was driving, which gave an audible signal indicating petitioner's desire to pass said motor truck; that as petitioner sounded said horn, the said motor truck veered or turned to the right of said highway; that from this action it appeared to petitioner that the driver of said motor truck had given way to the right side of said road for the purpose of allowing petitioner to pass on the left; that petitioner, having his car under control and driving at a legal and moderate rate of speed, thereupon proceeded to drive to the left of the center of said road, and at a distance to safely clear and pass said truck, all in accordance with the rules of the road as established by both custom and the laws of this State; that after petitioner had so proceeded to drive his father's said automobile to and along the left of said road to a point where the front part of said automobile had just passed the front of defendant's said motor truck, and when said automobile was beginning to forge ahead of said motor truck, and while petitioner was still proceeding along the left hand side of the said road in a straight direction, defendant's said motor truck, then being driven and operated by said S. M. Sims, its servant, agent and employee as aforesaid, suddenly, quickly, and without any signal or warning whatever, turned sharply from the right of said road, across the center line of said road, and on to the left of said road into the automobile then being driven by petitioner, striking said automobile on the side with great force, turning it over, and causing the injury and damage to petitioner as set forth in this petition.

"That the act of the said motor truck, operated by defendant's servant, agent and employee as aforesaid, in turning sharply across the said public highway without warning, and without petitioner in the least expecting the same, or having cause to expect the same, rendered it humanly impossible for petitioner to do anything whatever to avoid being struck by said motor truck."

It is conceded, as well as proved, that plaintiff sounded his horn both while he was passing J. F. Rhodes' Ford car and while approaching the oil truck. Sims denies having heard it at any time, and so do all the occupants of the Rhodes car. From the testimony in the case we think it certain that Sims has no recollection of having heard the horn, and yet there is testimony in the case that there was a kind of subconscious reaction on his part to the sounding of this alarm by the plaintiff.

Plaintiff alleges and testifies that he sounded his horn continuously as he was approaching the truck, and he is so thoroughly corroborated in this statement there can be no doubt concerning it. This fact alone proves conclusively that plaintiff was approaching the truck with the care and caution required by law. He testifies that he at

all times was remaining over on the left side of the road, running parallel with the truck over on the right side. He testifies further that as he was first catching up with the truck it veered to the right. Naturally he thought this movement was in response to his alarm, and he felt safe in forging ahead to complete the pass. He then says that suddenly, just as he was even with the truck, or possibly half a car length ahead of it, it turned to the left and struck his car on the running board and door, just in front of the right rear fender. It was this impact between the two vehicles that overturned plaintiff's car and sent him hurtling down the road.

Sims has an entirely different theory, and it is that he continued to drive on the right side of the road, and that the plaintiff veered to the right too soon in an effort to get in front of the truck, and that in this movement he sideswiped the truck and thus caused the accident described in plaintiff's petition.

The decision in this case turns upon the question as to whether the defendant suddenly swerved his truck from the right side of the road and crossed the center and struck plaintiff's car at an angle as it was about to pass him. The accident happened at a point about one and one-half miles north of the town of Montgomery, immediately in front of the home of Mr. L. L. Phillips, who lives just west of the highway. At a point a short distance south of the Phillips home J. F. Rhodes entered the highway ahead of the Sims oil truck in an old 1924 model T Ford touring car. The oil truck soon passed the Ford, and almost immediately thereafter plaintiff passed it and continued straight forward with the intention of passing the oil truck also. Mrs. Rhodes, who testified for the defendants, says that she and her husband had their attention directed across an adjoining field. Just a moment before the collision her husband remarked, "That is about the prettiest one I have ever seen." At that moment she heard the noise of the collision, and upon looking up saw the Buick roadster up in the air. She thinks that at that moment the left wheels of the truck were probably across the center of the road. She says that her husband also remarked that the truck appeared to be slowing down as though it were going into the Phillips' driveway on the left.

On this same point her husband, J. F. Rhodes, testifying for the defendant, said that it looked like the Buick cut around the front fender of the truck and then "went to flipping over and over." One of his answers in his testimony is as follows: "Q. What did you notice, if anything, of the truck turning either to the right or left at any time before you saw the collision? A. Well, the truck seemed to be slowing down. We were all go-

ing ahead down the road, and *I was gaining on it, the truck seemed to be slowing down* and the big car started around it the *truck slowed down a good deal.* I couldn't tell whether the truck varied any or not, but it seemed to me that the front fender of the big car hit the front fender of the truck. That's the way it seemed to me, but it all happened in the bat of your eye." (Italics ours.)

Taking this testimony in connection with that of his wife, we think it is conclusively proved that there was a slowing down of speed on the part of the truck just as it was reaching the Phillips home. It is important to know the cause of this slowing down at this particular point, for we think that the answer to the cause of the accident lies right there.

There is in evidence, and the defendants admit, that just a few seconds before and at a distance just a few feet south from the scene of the accident, the defendant Sims lit a cigarette. Sims says that the lighting of the cigarette was all over before the accident started, but the testimony of his own witness, Rhodes, convinces us that he was in the act of lighting the cigarette practically at the moment of the impact. Rhodes says, "Well, the truck seemed to be slowing down. We were all going ahead down the road and I was gaining on it. The truck seemed to be slowing down and the big car started around it, the truck slowed down a good deal." Now, what made the truck slow down at this point and moment? Undoubtedly the chauffeur, Sims, was lighting the cigarette, had taken his foot off the accelerator, had taken both hands off the steering wheel, and was letting the truck take care of itself. Plaintiff says that right at this point the truck turned to its right as though in response to his alarm, and that it then turned suddenly to the left and struck him. With reference to the question as to when, where, and how he lit his cigarette, the defendant Sims testified in part as follows:

"Q. Did you light a cigarette at any time during the time before you reached Rhodes and after you passed him, and if so when? A. Yes, sir, I lit a cigarette after I passed Rhodes. I remember taking out a packet of cigarettes out of my shirt pocket.

"Q. Describe how you did light anything after you passed Rhodes? A. I don't know how far above Rhodes I was, but just a second or two after I got around them I lit a cigarette. I have a habit of driving the truck with my right hand and I picked up my foot and struck the match on my shoe.

"Q. What was the speed you were going to make it unusual or dangerous thing for you to strike a match? A. No, sir. At the speed I was going I wasn't going more than twenty-five miles an hour when I did it, I just let the truck take care of it.

"How far had you gone after lighting of the match before Mr. McCain tried to pass you in the Buick car, or had you lit the cigarette at that time? A. I had done lit the cigarette.

"Q. How far had you traveled after you lit your cigarette before he tried to pass you? A. I don't know, I hadn't gone but just a little distance maybe fifty or sixty feet. It is hard to judge that because at the time it all happened a fellow wasn't judging distances.

"Q. Now, Mr. Sims, during the time you were lighting a cigarette or just before or after lighting the cigarette state whether or not you changed gears? A. No, sir.

"Q. What side of the road were you traveling on and continued to travel on after you passed Mr. Rhodes? A. The right hand side of the road. The road was wide there and usually there is always tracks in the road that you follow. That road is all level there and about as much travel on each side as there is in the center.

"Q. After you lighted the cigarette you continued to travel right on down the road? A. Yes, sir." * * *

"Q. Now, Mr. Sims, if you didn't hear a horn, what was the first knowledge you had of Mr. McCain trying to pass you along the highway there? A. The first thing I saw of Mr. McCain at that time, I didn't know him, I just heard something go B-A-M, and I looked and the car was going over."

Morris Jordan, a negro, who was riding in the back of the Rhodes car, knows nothing of the cigarette incident, but describes the accident as follows: "Q. Well, now what part of the road did you see it on just before the truck and the car came together? A. When I saw it it looked like it was going pretty close to the truck. It was straight on up the road the truck on its side and this car going straight up the road and the next thing I saw the car turn over like that (indicates)."

About forty minutes after the accident, Sims told Bryant McBride about it, in the town of Montgomery. In relating this conversation, McBride testified as follows:

"A. When he came back he asked me, says Mc., did you hear about the accident? I told him no, and he says a boy run into me up there by Lee Dean's. I asked him who it was and he said it was young McCain. I asked him which one of the McCains it was, and he says I don't know which one it was. So I says how did that happen. He says I was going down the highway and he was coming the same way and he says the first thing I noticed, I had just struck a match to light a cigarette, and just about that time he hit me and I saw the car.

"Q. Did he say whether he had his hands on the steering wheel or not? A. I am not sure about that. He said he was just lighting a cigarette when it happened.

"Q. Did he say he knew how it happened? A. He said he didn't know how it happened.

"Q. Did he say he knew which side of the road he was on? A. He didn't say.

"Q. Here is what I want, Mr. McBride, what statement if any did he make about going on what part of the road he was on? A. He told me, says when I lighted the cigarette I couldn't say exactly what happened because he says I don't know whether my car wobbled or not, or what position my car was in the road.

"Q. He said he didn't know what position his car was in the road, and he didn't know whether it wobbled or not? A. Yes, sir."

McBride's wife heard this same conversation of Sims with her husband, and she testified as follows:

"Q. Mrs. McBride, did Mr. Sims make a statement to your husband in your presence? A. He was talking to my husband but I worked there in front I had a short order place there.

"Q. How near were you to Mr. Sims? A. I was close to him—right at him.

"Q. Did you hear Mr. Sims state to your husband that he was lighting a cigarette just before the accident happened and had both hands off the steering wheel? A. I did.

"Q. Did you hear him say he didn't know just what part of the road he was in? A. I did."

Otis Wardlaw testified that Sims told him of the accident and said that, when he raised up from lighting the cigarette, he probably veered to the left, but that he did not hear the horn blow. Sid Shelton heard this same conversation, and he remembers Sims saying that he was lighting a cigarette and that it all happened so quickly he did not know how it happened.

Jack Dean, who helped put the plaintiff in the truck, heard Sims say that he was lighting a cigarette as the wreck happened.

Mrs. John I. McCain said that Sims told her that he hardly knew how the accident occurred, that he was lighting a cigarette, and, when he heard the horn blow, he looked around and swerved the truck left, and that it all happened so quickly that he did not know just how it did happen.

■ All this testimony convinces us that at the moment of, or just prior to, the collision, defendant Sims was lighting a cigarette without any thought of the proximity of plaintiff and his car, and for the time being lost control of the truck. This was negligence on his part, and was the proximate cause of the collision. In the excitement of the moment, caused by the sudden and unexpected ap-

pearance of plaintiff's car at his left side, the defendant had permitted the truck to be veered to the left without any control on his part, or steered it in that direction without thinking. In either case, he was negligent and is liable for the consequences of his act, either of omission or commission.

Another bit of testimony that is strongly corroborative of plaintiff's contention is that which relates to the tracks made by the truck immediately before the collision. Henry Durham testified that he was coming south toward Montgomery and heard the impact of the collision, but did not see it on account of the dust that was raised. He stated that he saw truck tracks at the scene running from right to left across the center of the road about three or four feet, and that it looked like the truck was fixing to turn into the driveway in front of the Phillips home just as Mrs. Rhodes says it appeared to her husband.

J. N. Carter saw these same tracks veering first to the right and then crossing the center of the road about the distance of one-half the width of the truck. Willard Walters, who picked up the wrecked car and towed it to a garage in Montgomery, testified that he saw these same truck tracks running over the center of the road to the left a distance of about two feet. Jimmy Scrugg saw the truck tracks coming across the center of the road to the left side where the Buick tracks were.

The testimony of these witnesses, taken in connection with the proved fact that defendant Sims was lighting a cigarette and had momentarily lost control of his truck just prior to the collision, is doubly convincing to us that the accident was caused by the negligent handling of the truck by Sims, one of the defendants.

If the defendant Sims were correct in his theory as to how the accident occurred, and if the plaintiff had caused it by cutting into the right of the road too soon to clear the truck after passing it, the Buick car and the plaintiff would have been hurled toward the right side of the road instead of the left, as they were. As a matter of fact, all signs of the wreck, such as the scarifying of the gravelled road, the spilling of oil, the scattering of broken glass, and the strewing of wreckage from the car, were entirely on the left side of the road. The plaintiff himself and his car both stopped on the left side and never, at any point, crossed the center of the road.

There was considerable discussion and dispute over the testimony of Calvin Satcher, a negro, and L. G. Smith, with whom Satcher was working. The former testified for the plaintiff, while the latter testified for the defendants. Their testimony has very little value in the case except to establish beyond a doubt that the plaintiff did sound his horn loud and long. These men saw the wreck from a distance across a field and over some fences. They were tearing down an old gin building and were standing on a raised platform. Their attention was first attracted by the continuous sounding of plaintiff's horn. They could see the tops of the vehicles, but could not see the roadbed, and could not tell whether either vehicle was over or across the center of the road.

Furthermore, the physical facts of the way in which the Buick was struck on the right, just in front of the rear fender, and was completely demolished, indicate to our minds that the truck struck the blow and was not sideswiped. If the truck had been sideswiped, the car might have been demolished as it was, but we think the damage to the truck would have been far greater than it was. The testimony on this point is that the only injury to the truck consisted of a broken hub cap, a dented left front fender, and a broken rear-view mirror fastened on the left front fender.

For the reasons stated above, we hold that the defendant Sims was guilty of such negligence as to render him personally liable for all damages sustained by the plaintiff. It remains now to determine whether the other defendant, Pan-American Petroleum Corporation, is also liable.

■ Under the arrangement existing between the two defendants, Sims furnished a truck chassis and the Pan-American Petroleum Corporation furnished an oil or gasoline tank, body, and a number of smaller oil containers on the sides. The services of Sims were engaged to distribute the petroleum products of the other, and a fixed rate of compensation was agreed upon between the parties, and apparently the relation of agent and principal was clearly recognized. The defendant Pan-American Petroleum Corporation arranged for and provided insurance against just such accidents as occurred in the joint names of both defendants. From all the evidence in the case, we cannot conceive of any other relationship between them than that alleged by the plaintiff.

■ While both defendants deny any negligence on their parts, they pleaded in the alternative the contributory negligence of the plaintiff. We conclude from the evidence that plaintiff never at any time crossed the center of the highway in his effort to pass the truck, but, on the contrary, the evidence convinces us that the truck did leave the right side and that that is what caused the wreck. The very fact that the plaintiff sounded his horn as long as he did would indicate his caution, and his caution in this respect would naturally be followed by his not undertaking to cross over to the right side of

the road in front of the truck before it was safe to do so.

In their brief, counsel for the defendants take the position that, even though the truck may have cut over to the left side of the road, as plaintiff claims it did, the truck driver had superior right at the moment, and could not be held liable to the plaintiff for a collision occurring on account of this sudden change of direction on the part of the truck. They take this position on the theory that plaintiff was driving behind and had a full and clear view of everything that was going on in front. Ordinarily, this might be true, but, even though the defendant's truck was built on a regular automobile chassis that was capable of making as much speed as any automobile, nevertheless it was a truck doing the work of a truck and was subject to the road regulations applicable to trucks. In support of this contention, counsel cite the case of Stevens v. Dean, 6 La. App. 537. In that case there was involved a collision between two automobiles. The defendant was represented by the same attorney who represents the present plaintiff, and also by the judge who tried the case now under consideration. The defendant was driving the car in front, while plaintiff was driving the other. The facts are stated as follows:

"The evidence shows that the respective automobiles were being driven on the right hand side of the road in the same direction and that the collision occurred while the plaintiff, who was driving at a speed of twenty-five or thirty miles an hour, was attempting to pass defendant's car which was being driven at a speed of twelve or fifteen miles per hour.

"The plaintiff, when at a distance of about one hundred fifty feet from defendant's car, gave a signal by sounding the horn, and when at a distance of about forty feet she turned her car to pass to the left of defendant's car and at about the same time the driver of defendant's car, after giving a signal of her intention to pass to the left of the road so as to drive straight into a driveway of a filling station which was situated on the right side of the roadway, placed defendant's car in such position that there was not sufficient space to the left of defendant's car for plaintiff to pass, and the front of plaintiff's car struck the rear of defendant's car."

In deciding the case in favor of the defendant, this court held that, while drivers of automobiles are bound to maintain a lookout and observe the way to the front, they cannot be held to such observance to their rear. It was also held that the forward car has the superior right and cannot be said to be negligent *so long as the driver uses the road in a lawful manner*. The opinion cites Blashfield on Automobiles, 425, which holds that, if the driver of an automobile is *on the prop-*

*er side of the highway*, he is not required to maintain as vigilant a lookout for vehicles coming up from the rear as he is required to maintain in watching for danger in front. This is good law, but it will be observed that this statement is based on the proviso that the vehicle is on the *proper side of the highway*. Further on in the cited article it is stated that the forward car owes no duty to the overtaking car until its driver has been made aware of the presence of such rear car by signal or otherwise. It is also stated that it is the general rule that the forward car has the superior right and may keep its position *in the center of the road* if there is sufficient space on the left to enable the approaching car safely and conveniently to pass. A similar quotation is cited from Berry on Automobiles (6th Ed.) § 1034, but this authority bases his declaration upon the proviso that "the man ahead is driving in accordance with his rights."

The Stevens Case is not applicable to the case at bar. We do not find that the driver of the truck was using the highway in a lawful manner. Either inadvertently or intentionally, he ran unexpectedly across the center of the road.

Section 11 of Act No. 296 of 1928 provides that all drivers of vehicles shall drive on the right half of the highway, and that slow-moving vehicles shall be driven as close as possible to the right-hand edge. In this case the oil truck should have been absolutely on the right half and as near the edge as possible. If it should become necessary to drive out of this prescribed part, the driver must know that the way is clear and that it can be done with safety and convenience. Furthermore, the law requires all trucks such as the one owned by the defendants to be equipped with a rear-view mirror. In this instance the truck was so equipped, and, if the driver had been using the necessary precaution, he would have seen the plaintiff's car approaching, even though he could not hear the sounding of the horn. It is true that, if the forward car driver does not hear the horn of the approaching car, he is not liable for not having done so. But if, even inadvertently, he appears to have heard it, and at the proper moment has actually left the center of the road where, under our law, he has no right to drive, and drives to the right edge of the road, the approaching car driver would be justified in believing that he was thus driving to the right edge to accommodate him in response to his signal. Then, if, just as the driver of the approaching car gets even with him in his effort to pass, the driver of the forward car should undertake suddenly to resume his position in the middle of the road without ever having been aware of the presence of the car, and if the result of such a movement on his part should be a collision, the fault or negligence would be

that of the forward car and not of the other. In that case the driver of the approaching car would be justified in believing that his signal had been heard and in acting accordingly. As we read the record in this case, that is just what happened. Even though he is an interested party, it must be conceded that the plaintiff is the best qualified to speak in this case. He says the truck turned first to the right as if in response to his signal, and then turned suddenly to the left. Rhodes says he observed the truck slowing to such an extent that he himself was gaining on him, and his wife says he said the truck appeared to be about to turn to the left into the Phillips driveway. The truck driver says it all happened so quickly and unexpectedly that he does not know how it happened. All these facts as testified to absolutely harmonize with the theory that the cigarette lighting incident caused the accident, and that no negligence on the part of the plaintiff contributed to it in any manner.

The judge of the lower court spent five days trying the case, and had ample time and opportunity to see, hear, and appraise each witness, and it was his deliberate opinion that the defendants are liable, and we can find no flaw in his reasoning nor error in his finding. We have studied the voluminous record in the case as carefully as could be done, and, after reviewing it from every angle and giving due consideration to the arguments of able counsel as set forth in their briefs, we have been irresistibly drawn to the conclusion that the defendants are liable in solido for the injuries received by the plaintiff.

### Quantum of Damages.

This is the most difficult portion of the case to decide. The trial judge, in his written opinion, found that the plaintiff had incurred actual medical expenses in the sum of $402.50. He found further that he should recover damages for (1) physical suffering, (2) mental anguish, and (3) decrease in earning power. Without stipulating any special sum for a specific injury, he awarded judgment for a lump sum of $7,000. Defendants claim that this is excessive and should be reduced to $2,500 at the most. Plaintiff contends that it is entirely inadequate, and should be increased to at least $20,000. The trial judge saw the plaintiff, observed his physical condition and general demeanor, and no doubt is personally acquainted with him. We believe he wanted to be fair to both sides. In cases of this kind, where the views of the litigants are so conflicting, it is always difficult to properly appraise the damage. The trial judge is in the best position to do it, and, unless his estimate is clearly erroneous and out of line, we prefer not to disturb it. Plaintiff's suffering was no doubt terrific, both physical and mental, but as we read the record there is some doubt about the permanency of the disability. In plaintiff's brief, there is reference to some expert medical testimony introduced by the defendants, but it is not discussed at all. The defendants make no reference to it whatever. We do not find it in the record, but, under the circumstances, do not think it necessary to remand the case to have it supplied. We think that possibly the amount awarded by the lower court is somewhat excessive and should be reduced.

For the reasons assigned, the judgment appealed from is amended by reducing the sum awarded to $5,402.50, and, as thus amended it is affirmed, the costs of the lower court to be paid by the defendants, and those of this court by the plaintiff.